BROWNE GEORGE ROSS LLP
K.C. Maxwell (State Bar No. 214701)
  kmaxwell@bgrfirm.com
David Wakukawa (State Bar No. 262546)
  dwakukawa@bgrfirm.com
101 California Street, Suite 1225
San Francisco, California 94111
Telephone: (415) 391-7100
Facsimile: (415) 391-7198

Attorneys for Defendant
MICHAEL NAVONE

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 3:13-cr-00804 CRB |
| Plaintiff, | |
| vs. | **SENTENCING MEMORANDUM OF DEFENDANT MICHAEL NAVONE AND OBJECTIONS TO PRESENTENCE REPORT** |
| MICHAEL NAVONE, | |
| Defendant. | |

Judge:    Hon. Charles R. Breyer
Date:     April 26, 2018
Time:     1:30 p.m.
Crtrm.:   6, 17th Floor
          450 Golden Gate Avenue
          San Francisco, CA  94102

Trial Date:  None Set

I.      **PRELIMINARY STATEMENT**

Defendant Michael Navone ("Defendant" or "Navone"), by and through his counsel, respectfully submits the following Sentencing Memorandum and Objections to the Presentence Report ("PSR").  Navone pleaded guilty to two counts of conspiracy to rig bids to obtain properties in San Francisco and San Mateo counties in violation of 15 U.S.C. Section 1.  (*See* PSR, ECF No. 38, ¶¶ 1-2)

Mr. Navone's involvement in this enterprise represents an aberration from his life of hard work and generosity toward others.  Longtime friends and even his ex-wife have written letters in support of Mr. Navone's good character.  In addition to and beyond the punishment imposed by this Court, Mr. Navone faces career-ending consequences in the potential revocation of his real estate license, the only field of work he has known for over twenty years.  He wishes to accept his just punishment from this Court and the California Bureau of Real Estate, and get back to working to support his children, adopted children, and ailing mother.  He asks that this Court consider those factors in determining his appropriate sentence.

II.     **PLEA AGREEMENT AND RECOMMENDATION**

The terms of Mr. Navone's Plea Agreement with the United States establish a total offense level of 15, an adjusted offense level of 13 and a fine of $29,083-$145,417.  (Plea Agreement, ECF No. 36, ¶ 8) (A copy of Mr. Navone's Plea Agreement is also attached as Exhibit A to the Declaration of KC Maxwell).  The Government agreed to recommend a fine of between $5,000 and $50,000, and no restitution (¶¶ 9, 11); the Government ultimately recommended a fine of $5,000. (ECF No. 40)

United States Probation has calculated Mr. Navone's adjusted offense level as 13 and his criminal history category as I.  United States Probation does not recommend a custodial sentence given that location monitoring in lieu of custodial sentences is being recommended to similarly situated defendants, including those with more significant assets.  (PSR at 24)  U.S. Probation recommends a sentence of 3 years' probation, with 6 months of home confinement.  (*Ibid.*) Probation further recommends a fine of $40,000.  (*Ibid.*)

III.   **COOPERATION WITH THE GOVERNMENT**

Mr. Navone fully cooperated with the Government at the first opportunity.  As the Government has noted, Mr. Navone's assistance was substantial.  He "immediately began cooperating," and his cooperation and plea may have influenced the decisions of others who pleaded after him.  (ECF No. 40 at 4)  Additionally, he provided "two candid interviews" with the FBI and provided corroborating information.  (*Ibid.*)

Pursuant to Section 5K1.1, substantial assistance may justify a departure from the guidelines.  § 5K1.1 & Note 1.  That sentencing reduction is considered independent of Defendant's acceptance of responsibility.  *Id.*, Note 2.  The extent of the departure is committed to the discretion of this Court.  *United States v. Keene*, 933 F.2d 711, 713-15 (9th Cir. 1991).  Mr. Navone submits that, in addition to, and independent of, the Section 3553(a) factors, his timely and full cooperation with the Government warrants a non-Guidelines sentence.

IV.   **LEGAL STANDARDS GOVERNING SENTENCING**

After the United States Supreme Court decision in *United States v. Booker*, 543 U.S. 220 (2005), the Federal Sentencing Guidelines are no longer mandatory.  District courts once again have broad discretion to take the factors set forth in 18 U.S.C. § 3553(a) into account at sentencing:

> [I]n determining the appropriate sentence, the court should consider a number of factors, including "the nature and circumstances of the offense," "the history and characteristics of the defendant," "the sentencing range established" by the Guidelines, "any pertinent policy statement" issued by the Sentencing Commission pursuant to its statutory authority, and "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." *Ibid.* In sum, while the statute still requires a court to give respectful consideration to the Guidelines, .., Booker "permits the court to tailor the sentence in light of other statutory concerns as well."

*Kimbrough v. United States*, 552 U.S. 85, 128 S. Ct. 558, 570 (2007) (internal citations omitted); *see also Gall v United States*, 552 U.S. 38, 128 S. Ct. 586 (2007).

Further, "[section 3553(a)], as modified by *Booker*, contains an overarching provision instructing district courts to 'impose a sentence sufficient, but not greater than necessary' to

1  accomplish the goals of sentencing, including 'to reflect the seriousness of the offense,' 'to

2  promote respect for the law,' 'to provide just punishment for the offense,' 'to afford adequate

3  deterrence to criminal conduct,' and 'to protect the public from further crimes of the defendant.'"

4  *Kimbrough*, 128 S. Ct. at 570 (emphasis added); 18 U.S.C. § 3553(a).  District courts are now

5  allowed to vary from Guidelines ranges based solely on policy considerations, including

6  disagreements with the Guidelines.  *Id*.; *cf. Rita v. United States*, 551 U.S. 338, 127 S. Ct. 2456,

7  2465 (2007) (a district court may consider arguments that "the Guidelines sentence itself fails

8  properly to reflect § 3553(a) considerations").

9       Under the circumstances of this case, a sentence under the advisory Guidelines would "be

10  greater than necessary" to accomplish the goals of sentencing.

11  **V.      SECTION 3553(a) FACTORS**

12       "It has been uniform and constant in the federal judicial tradition for the sentencing judge

13  to consider every convicted person as an individual and every case as a unique study in the human

14  failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue."

15  *Pepper v. United States*, 131 S. Ct. 1229, 1239-40 (2011) (citation omitted).  This tradition is

16  based on the principle that the punishment must fit the offender, not just the crime.  *Id.* at 1240.

17  **A.      Section 3553(a)(1) – The History and Characteristics of Navone**

18       Michael Navone is 50 years old.  He was born in San Francisco to his parents, George

19  Navone and Gladys Rowe, both 79 years old.  The Navones divorced when Mr. Navone was 13

20  years old, and the split at this formative age necessitated that Mr. Navone receive counseling.

21  (PSR ¶¶ 46, 59)[1]

22  **1.      Generous Caregiver and Father**

23       Mr. Navone did not have a father figure until he was 18, when his mother remarried to

24  William Rowe.  Defendant and his father have since reconciled, and they are now very close.  His

25  father describes Mr. Navone as a "good son, [] kind and generous."  (PSR ¶ 47)

26

27  _____

28  [1] The information in the PSR was verified by Mr. Navone's father and ex-wife.  (PSR ¶ 45)

1    Mr. Navone lives with his mother Gladys.  After his stepfather and Gladys's husband died

2  of cancer in 2011, Mr. Navone moved his mother into his home.  Gladys suffers from severe

3  anxiety and depression, as well as a heart condition.  (PSR ¶ 46)  He is her sole caregiver and has

4  been since 2011.  (PSR ¶ 46)  Were Mr. Navone to be sentenced to a custodial term, he believes

5  that his mother would need to be moved to an assisted living facility.  (PSR ¶ 49)[2]

6    In his free time Mr. Navone spends time with his mother and 18-year old son, who

7  currently lives with Mr. Navone and plans to attend college starting in the fall.  Mr. Navone

8  volunteers with the Boy Scouts of America, where his son recently earned the rank of Eagle Scout.

9  (¶ 49)

10    Mr. Navone and Colleen Kopp married in 1997.  Ms. Kopp already had a son from a

11  previous relationship and Mr. Navone treated the boy as his own child.  (PSR ¶ 50)  Mr. Navone

12  and his wife had another son together, the Eagle Scout who is about to graduate high school.  They

13  divorced in 2004 after eight years of marriage because Mr. Navone worked too much.  (PSR ¶ 50)

14  Ms. Kopp nevertheless describes Mr. Navone as "supportive, helpful, caring, and generous," and a

15  good parent to their children.  (PSR ¶ 51)

16    In 2006 Mr. Navone and Frances Yankie started seeing each other.  Like Ms. Kopp, Ms.

17  Yankie had children from a prior relationship, whom Mr. Navone cared for like his own.  (PSR ¶

18  52)

19         **2.    Letters of Support**

20    Gregory Chidlaw, a friend of Mr. Navone for nearly twenty years, writes that Mr. Navone

21  is a "modest, generous" man who, after his stepfather passed away, moved his mother into his

22  home and cared for her "everyday since."  (Letters of Support written on behalf of Mr. Navone are

23  attached as Exhibit B to the Maxwell Declaration).  Another friend reports that Mr. Navone has

24  worked hard and succeeded to instill a sense of honesty and integrity in his son, who excels in

25  school and plans to attend a university in the UC system in the fall.  (Letter of Howard Epstein).

26  ───────────────

27  [2] Although Mr. Navone has a younger brother who lives in Petaluma, he and Mr. Navone had a
falling out years ago, after Mr. Navone confronted him about not visiting or helping with the care

28  of their mother.  (PSR ¶ 48)

1   Kevin Payne, a colleague and friend of Mr. Navone of 14 years, became friends while

2   Payne was a struggling single father with no place to live.  Mr. Navone helped Mr. Payne find

3   housing for himself and his infant child.  Later, when Payne worked nights driving a limousine to

4   make ends meet, Mr. Navone volunteered to watch Payne's two-year-old son, Dylan.  Dylan and

5   his father spend their holidays at Mr. Navone's, whom Dylan came to know as "Uncle Mikey."

6   Now a teenager, Dylan still spends time with Uncle Mike and calls him for advice.  Kevin Payne

7   also expresses admiration for the care that Mr. Navone provides to his aging mother, spending

8   time with her and attending to her needs.  (Letter of Kevin Payne).

9   Perhaps the best account of Mr. Navone's character comes from someone with an

10  unvarnished and unbiased view of Mr. Navone: his ex-wife, Colleen Kopp.  Ms. Kopp describes

11  her ex-husband as "without a doubt [] a trustworthy, stable, kind, generous man and father."  She

12  writes she and Mr. Navone started dating when she was a single parent with a three-year-old son,

13  Nick, whom Mr. Navone "took [] under his wing 100% and helped me raise him in every way."

14  She writes that Mr. Navone remains extremely close with Nick, and has been a positive force in

15  his life.  Although they divorced in 2005, Mr. Navone and Ms. Kopp maintain a healthy

16  friendship, and he provides emotional support to her and Nick through challenging periods.  She

17  writes that, through the years, including through good times and bad, Mr. Navone "dropped

18  everything" to help her and her sons.  (Letter of Colleen Kopp).

19   **3.   <u>Health Struggles</u>**

20  When Mr. Navone was 33 years old he suffered a stroke due to stress and overwork.  (¶

21  57)  He suffered a second stroke in November 2017.  (*Ibid.*)  During his hospitalization for that

22  recent stroke, Mr. Navone was diagnosed with moderate sleep apnea; for his heart condition, he

23  was prescribed Lipitor 80 mg, Lisinopril 10 mg, and aspirin, which he continues to take.  (¶ 58)

24  He is also being evaluated for atrial fibrillation and wears a heart monitor.  (¶ 58)  As a result of

25  his recent stroke, Mr. Navone has been suffering from dizziness, short term memory issues, and

26  vision problems in his right eye.  (*Ibid.*)

27

28

1    **B.    The Nature and Circumstances of the Offense**

2           Mr. Navone was not a founder or leader of the conspiracy.  At its heart were the "Big

3    Five," which did not include Mr. Navone.  (PSR ¶ 8)  Joseph Giraudo was the leader of the group.

4    (*Ibid.*)

5           Mr. Navone's participation lasted less than two years, from around February 2009 to

6    January 2011.  (¶15)  Mohammed Rezaian, a former coworker, invited Navone to work with him

7    purchasing foreclosed properties at auction.  (¶ 15)  Navone raised approximately $4 million from

8    passive investors, which were held by the entity Courthouse Steps II.  Navone, Rezaian, and two

9    other partners split between them 50% of the profits, with the other half going to investors.  (*Ibid.*)

10   In relation to another entity, Maximo Management, Navone was paid 30% of the profit from

11   investors he recruited.  (*Ibid.*)  The parties stipulated that Mr. Navone participated in rigging the

12   sale of 35 properties from both auctions, and to a volume of commerce figure of $2,908,337.  (*Id.*

13   at ¶ 20)

14          Only later, sometime in 2010, did Mr. Navone become directly involved in negotiating

15   payoffs.  (*Id.* at ¶¶ 18-19)

16           The evidence showed that Mr. Navone did not keep any payoff money but instead passed

17   that money to a co-conspirator.  (PSR ¶ 21)  On the basis of that evidence the parties agreed to

18   recommend that the Court order Defendant to pay no restitution.  (*Ibid.*)

19   **C.    Section 3553(a)(2)**

20          Section 3553(a)(2) directs the Court to evaluate a sentence sufficient to "(A) reflect the

21   seriousness of the offense, to promote respect for the law, and to provide just punishment for the

22   offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from

23   further crimes of the defendant; and (D) to provide the defendant with needed educational or

24   vocational training, medical care, or other correctional treatment in the most effective manner."

25   As the Supreme Court in *Kimbrough* made plain, the Court should fashion "a sentence sufficient,

26   but not greater than necessary" to meet these goals.  552 U.S. 85, 101.  A fair consideration of

27   those factors tilts in favor of a sentence below the Guidelines range.

28

SENTENCING MEMO. OF DEFENDANT MICHAEL NAVONE; OBJECTIONS TO PRESENCE REPORT

1    Mr. Navone does not dispute that his crime was serious and one that must be deterred.  He

2  has internalized that seriousness and has lived with it every day since this case began over seven

3  years ago.[3]  The stress from that likely contributed to his humbling and frightening recent medical

4  struggles.

5    In addition to the psychological and physical costs, Mr. Navone already has suffered and

6  will suffer further professional and reputational damages.  Mr. Navone has worked in the real

7  estate industry for over twenty years, the same line of work as his father.  As a result of his

8  conviction, he faces the potential suspension or revocation of his real estate license.  *See, e.g.*,

9  Business and Professions Code Sections 490, 10177 (providing for suspension or revocation of

10  real estate license after conviction of a crime).  That line of work has been the entirety of Mr.

11  Navone's professional life, and the sole source of his income to support his family (as well as to

12  pay whatever fine ordered by this Court).  The California Bureau of Real Estate revokes, suspends,

13  or causes the surrender of hundreds of real estate licenses each year.[4]

14    In January Mr. Navone disclosed this case when he applied for renewal of his license.  The

15  Bureau of Real Estate responded that it needed additional review to process his application and

16  would be assigning a Special Investigator to his case.  Mr. Navone believes that there is a high

17  likelihood that his renewal application will be denied and/or his license revoked upon his final

18  conviction.  Mr. Navone submits that a term of probation, including months of house arrest,

19  adequately reflects the seriousness of Mr. Navone's offense and affords adequate deterrence to

20  criminal conduct.  There is no indication that Mr. Navone poses a threat to the public.

21    **D.    Section 3553(a)(3) - (a)(5)—Advisory Guidelines**

22    When carrying out its duty to fashion a sentence "sufficient, but not greater than

23  necessary" to comply with the purposes of punishment set forth in 18 U.S.C. § 3553(a)(2), the

---

24  [3] Although the Information against Mr. Navone was filed in December 2013, the overt
25  investigation into Mr. Navone began in January 2011.

26  [4] "California Department of Real Estate Revokes Record Number of Real Estate Licenses," (July
27  28, 2010) *BusinessWire*, available at:
   https://www.businesswire.com/news/home/20100728006654/en/California-Department-Real-
28  Estate-Revokes-Record-Number.

1   Court must consider the guidelines sentencing range and any applicable Sentencing Commission

2   policy statements.  18 U.S.C. § 3553(a)(4).  But the Court "may not presume that the Guidelines

3   range is reasonable."  *United States v. Carty*, 520 F.3d 984, 991, 994 (9th Cir. 2008) (citing *Gall v.*

4   *United States*, 552 U.S. 38, 50 (2007), and *Rita v. United States*, 551 U.S. 338, 351 (2007)).  "Nor

5   should the Guidelines factor be given more or less weight than any other.  While the Guidelines

6   are to be respectfully considered, they are one factor among the § 3553(a) factors that are to be

7   taken into account in arriving at an appropriate sentence."  *Id.* at 991; *see also Kimbrough*, 552

8   U.S. at 90; *Gall*, 552 U.S. at 48-50, 59.

9         Mr. Navone concurs with U.S. Probation that a downward variance from the Guidelines

10   range is appropriate in his case.  (PSR at 23)  There are multiple grounds to do so.

11        First, Mr. Navone is recovering from a recent stroke, has been diagnosed with sleep apnea,

12   and is being monitored for atrial fibrillation.  His need for medical care, 18 U.S.C. §

13   3553(a)(2)(D), is a factor to be considered.  (PSR ¶ 88)

14        Second, Defendant is the primary caregiver for his 79-year old mother with her own heart

15   problems, as well as severe anxiety and depression.  She lives with him and is dependent on him

16   for her basic necessities.  This is another factor to be considered pursuant to 18 U.S.C. ¶

17   3553(a)(1).  (PSR ¶ 89)

18        Mr. Navone submits that there is a third basis for variance: he has lived his life as a

19   hardworking caregiver not only to his blood relatives, but also to children he chose to treat as his

20   own.  Regardless of whether the offense conduct might technically meet the requirements for an

21   "aberrant behavior" downward departure under the Guidelines, this crime clearly constitutes

22   aberrant behavior in the life of Mr. Navone for the purposes of assessing a proper variance.

23   "[S]urely, if ever a man is to receive credit for the good he has done, and his immediate

24   misconduct assessed in the context of his overall life hitherto, it should be at the moment of his

25   sentencing, when his very future hangs in the balance."  *United States v. Adelson*, 441 F. Supp. 2d

26   506, 513-514 (S.D.N.Y. 2006); *see also United States v. Toback*, 2005 WL 992004, *5 n.1

27   (S.D.N.Y. 2005) (Sweet, J.) ("The Court is not departing downward under the aberrant behavior

28

1  rationale. Instead, the Court is imposing a non-Guideline sentence, relying, in part, on the

2  aberration of the instant offense in defendant's typically law-abiding life.").

3  **E.      Section 3553(a)(6)—Avoid Unwarranted Sentence Discrepancies**

4        U.S. Probation notes that it is recommending for "similarly situated defendants" location

5  monitoring in lieu of a custodial sentence.  (PSR at 24)  The PSR also notes that Mr. Navone's

6  assets "are not significant in relation to codefendants."  (*Ibid.*)

7  **F.      Section 3553(a)(7)—Need to Provide Restitution**

8        The PSR does not recommend restitution and the parties agreed to no restitution.  (¶ 21, p.

9  23)  The PSR also notes that Defendant did not keep any of the payoff money.  (*Ibid.*)

10  **VI.   RESPONSE TO GOVERNMENT'S REQUEST**

11        The Government asks that Mr. Navone be sentenced to eight months of custody.  (ECF No.

12  40)  It reasons that such a sentence is "not greater than necessary" to reflect the seriousness of the

13  offense, promote respect for the law, and adequately deter similar crimes.

14        That punitive request does not consider the history and characteristics of Mr. Navone, and

15  ignores the recommendation of the U.S. Probation Office, including the factors for downward

16  variance identified in the PSR.  With the sole exception of his involvement in this conspiracy, Mr.

17  Navone has been a hardworking citizen and dedicated father to his child and others' children.  He

18  will likely have his real estate license revoked.  And he is still recovering from a debilitating

19  stroke suffered in November, which likely was substantially brought on by the stresses of his

20  conviction and the prolonged investigation and prosecution.  Sentencing Mr. Navone to a term of

21  imprisonment would interfere with his medical care and force him to move his ailing mother out

22  of his home and into an assisted living facility.

23        These facts specific to Mr. Navone's situation are important considerations along with the

24  generalized policy goals of punishment and deterrence.  Mr. Navone has experienced significant

25  collateral consequences from this prosecution and he has fully accepted responsibility.  He does

26  not need further deterrence; he will never commit another crime.  These significant consequences

27  also should be sufficient to deter others from contemplating engaging in similar crimes.

28

## VII.    REMAINING OBJECTIONS TO PSR

### 1.    Volume of Commerce

The PSR identifies the volume of commerce attributable to Mr. Navone as $2,908,337. (PSR at 23)  Although the parties stipulated to this volume of commerce, Mr. Navone submits that figure is beyond the volume of commerce properly attributable to him and overrepresents his degree of culpability.  Only around the time he received the draft PSR did Mr. Navone obtain clarifying information about his actual participation in each property.  According to those records, the Government's Property List overstates Mr. Navone's involvement.

The $2,908,337 VOC figure includes properties in which Mr. Navone did not own any share, or owned a lesser share than that attributed to him, including the following[5]:

| Property # on List and Address | Winning Bid | Share Attributed | Actual Share | Attributed VOC | Actual VOC |
|---|---|---|---|---|---|
| 1- 225 Wyandotte Ave. | $296,760 | 33% | 0 | $99,587 | 0 |
| 2- 28 S. Norfolk | $320,200 | 20% | 10% | $66,040 | $33,020 |
| 3- 1297 Edgewood | $235,550 | 33% | 16.67% | $80,500 | $40,250 |
| 4- 211 Ramona St. | $333,550 | 25% | 12.5% | $86,888 | $43,444 |
| 5- 738 Evergreen | $413,100 | 25% | 0 | $109,275 | 0 |
| 7- 1021 Rhode Island | $382,694 | 20% | 7% | $86,539 | $30,288.65 |
| 8- 212 Lux Avenue | $299,050 | 20% | 0 | $61,490 | 0 |
| 10- 32 Arrowhead | $224,438 | 16.66% | 0 | $47,406 | 0 |
| 12- 2608 Sutter | $298,200 | 0 | 0 | $6,000 (payoff) | 0 |
| 15- 2250 33rd Ave. | $535,477 | 50% | 12.5% | $268,739 | $67,184.75 |
| 18- 5003 Palmetto Ave. | $203,482 | 25% | 0 | $51,961 | 0 |
| 21- 158 Santa Barbara | $330,200 | 0 | 0 | $4,500 (payoff) | 0 |
| 22- 501 Lynbrook Dr. | $398,613 | 33% | 0 | $134,871 | 0 |
| 23- 15 Parnell Ave. | $513,400 | 0 | 0 | $2,000 (payoff) | 0 |
| 24- 67 Penhurst Ave. | $446,250 | 0 | 0 | $12,500 (payoff) | 0 |
| 26- 1815 Edgewood | $489,000 | 0 | 0 | $30,000 | 0 |
| 30- 5152 Shelter Creek | $176,400 | 20% | 0 | $37,280 | 0 |

[5] The Government's original chart of properties is attached as Exhibit C to the Maxwell Declaration.

| | | | | | |
|---|---|---|---|---|---|
| 32- 714 Ellsworth St. | $318,500 | 16.66% | 0 | $56,083 | 0 |
| 34- 434 Hanover St. | $264,300 | 20% | 0 | $59,360 | 0 |
| **TOTAL** | | | | **$1,301,019** | **$214,187.40** |

Mr. Navone objected to the original volume of commerce figure. The final PSR stays with that original volume, based on an analysis that Mr. Navone is responsible for the acts of coconspirators under Section 1B1.3. However, the applicable guideline is not 1B1.3, but Section 2R1.1 ("Bid-Rigging, Price-Fixing, or Market-Allocation Agreements Among Competitors").[6] Under that section, the standard is not the broader "relevant conduct" of the conspiracy, but the "volume of commerce attributable to the defendant," which is defined as the "volume of commerce done by him or by his principal in goods or services that were affected by the violation." USSG § 2R1.1(b)(2).

The Government's table acknowledges that the proper methodology for calculating the volume of commerce attributable to Mr. Navone looks not at the total volume affected by the conspiracy, but by Mr. Navone's proportional share. (Exhibit C to Maxwell Dec.) Correctly identifying Mr. Navone's share results in a reduction in the volume of commerce to $1,821,505.40.

## 2.   **Financial Capacity**

The PSR also finds that Mr. Navone would be capable of paying a "significant fine" if ordered. (¶ 68) Mr. Navone objected to this finding, but Probation did not resolve that objection in his favor. Defendant continues to disagree with that assessment. As the PSR notes, Mr. Navone has a net worth of $399,581. (PSR ¶ 67) Most of his assets, save about $23,000 in non-retirement accounts, are illiquid assets, including outstanding loans to friends, bridge loans related to property, and partial ownership in two pieces of real estate which cannot be liquidated without the cooperation of his co-investors. (*Ibid.*) Mr. Navone also wishes to help his eighteen-year-old son transition into a four-year university this fall. These expenses are not reflected in his current statement of expenses.

---

[6] Guidelines Section 1B1.3(a) states that the relevant conduct shall include coconspirators' activities, "[u]nless otherwise specified." Because Section 2R1.1 provides a different and more specific standard, Guideline 1B1.3 directs this Court to consider 2R1.1 instead.

SENTENCING MEMO. OF DEFENDANT MICHAEL NAVONE; OBJECTIONS TO PRESENTENCE REPORT

1

### 3.      **Appropriate Fine**

2      "In setting the fine for individuals, the court should consider the extent of the defendant's

3 participation in the offense, the defendant's role, and the degree to which the defendant personally

4 profited from the offense."  USSG § 2R1.1, Application Note 2.

5      Mr. Navone agrees that his fine should be $5,000, as proposed by the Government.  (ECF

6 No. 40 at 1)  Mr.  Navone participated in the conspiracy for less than two years, and directly in

7 negotiating payoffs for one-year.  He was not a member of the "Big Five," and his involvement

8 did not make him a rich man.  What net worth he has was built through his own hard work, the

9 stress of which led to a stroke at the age of 33 and a divorce from the mother of his son.

10      Mr. Navone's plea agreement provides for a recommended fine of between $5,000 and

11 $50,000.  (Plea Agmt., ¶ 9)  For the reasons set forth above, Mr. Navone submits that the $40,000

12 fine recommended in the PSR is greater than necessary, especially given that in comparison to his

13 codefendants, Mr. Navone's assets are "not significant."  (PSR at 24)

14

### 4.      **Location Monitoring**

15      Mr. Navone disagrees with Probation's recommendation of participation in the Location

16 Monitoring Program.  (PSR at 25)  He does so because wearing a visible ankle monitor will

17 impede his ability to find gainful employment.

18      Besides being detrimental to Mr. Navone's ability to rehabilitate, he submits that location

19 monitoring is unnecessary.  Mr. Navone has known he was a subject of investigation since at least

20 January 2011 when he was interviewed by the FBI.  He has been a named defendant since 2013.

21 He has cooperated extensively, complied with all pretrial conditions, and appeared for all

22 appearances and interviews.  He has never gone anywhere without permission from Pretrial

23 Services and poses no risk of flight or noncompliance.

24 **VIII.   CONCLUSION**

25      For the foregoing reasons, Defendant Michael Navone respectfully requests that this Court

26 adopt the recommendation of the U.S. Probation Office and impose a non-custodial sentence for

27

28

SENTENCING MEMO. OF DEFENDANT MICHAEL NAVONE; OBJECTIONS TO PRESENCE REPORT

1    the sake of his health and that of his mother, reject its recommendation that he be required to

2    submit to ankle monitoring, and impose a fine of $5,000.

3

4    DATED:  April 19, 2018                     Respectfully submitted,

5                                                              BROWNE GEORGE ROSS LLP
                                                               K.C. Maxwell
6                                                              David Wakukawa

7

8                                                    By:      _____/s/ K.C. Maxwell_____

9                                                                   K.C. Maxwell
                                                     Attorneys for Defendant MICHAEL NAVONE
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

SENTENCING MEMO. OF DEFENDANT MICHAEL NAVONE; OBJECTIONS TO PRESENTENCE REPORT